IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL HARLANDER,<br><br>        Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>        Defendant. | Case No.: 1:10-cv-01970 JLT<br><br>ORDER DIRECTING REMAND PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF DANIEL G. HARLANDER AND AGAINST DEFENDANT MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY |

    Daniel Harlander ("Plaintiff") asserts he is entitled to supplemental security income under Title XVI of the Social Security Act. Plaintiff argues the administrative law judge ("ALJ") erred in his evaluation of the evidence. Therefore, Plaintiff seeks judicial review of the administrative decision denying her claim for benefits. For the reasons set forth below, the administrative decision is **REMANDED** for further proceedings.

## PROCEDURAL HISTORY[1]

    Plaintiff filed an application for supplemental security income on February 11, 2008, alleging disability beginning January 1, 2008. AR at 112-19. Plaintiff's application was denied initially and upon reconsideration. *Id.* at 64-68, 70-74. After denial of benefits, Plaintiff requested a hearing, which was held before an ALJ on August 25, 2009. *Id.* at 30.

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

The ALJ determined Plaintiff was not disabled as defined under the Social Security Act and issued an order denying benefits on November 13, 2009. AR at 18-29. Plaintiff requested a review by the Appeals Council of Social Security, which denied review of the ALJ's decision on July 23, 2010. *Id.* at 3-6. Therefore, the ALJ's determination became the decision of the Commissioner of Social Security ("Commissioner").

## **STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938). The record as a whole must be considered, as "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## **DISABILITY BENEFITS**

To qualify for supplemental security income under Title XVI of the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  When a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## DETERMINATION OF DISABILITY

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 416.920 (a)-(f).  The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level.  *Id.*  In making these determinations, the ALJ must consider objective medical evidence and opinion (hearing) testimony. 20 C.F.R. § 416.927.

A.   Relevant Medical Evidence

Dr. Miguel Hernandez performed a comprehensive internal medicine evaluation on April 9, 2008.  AR at 221-25.  Dr. Hernandez noted Plaintiff's chief complaints were (1) anxiety disorder, (2) rage and explosive disorder, (3) chronic back pain/ scoliosis, and (4) chronic obstructive pulmonary disease.  *Id.* at 221.  Plaintiff reported he had the rage and explosive disorder "all of his life" and the anxiety disorder, which was "getting worse," for more than ten years.  *Id.*  Further, Plaintiff reported suffering from "back problems for about seven years or more," and he was diagnosed with chronic obstructive pulmonary disease.  *Id.*  Dr. Hernandez tested Plaintiff's ranges of motion in his joints and back, as well as Plaintiff's motor strength.  *Id.* at 223-24.  Based upon his examination, Dr. Hernandez opined Plaintiff had the ability to sit for six hours in an eight-hour day, or stand and walk for six hours with routine breaks.  *Id.* at 224.  However, Dr. Hernandez observed, "I would imagine with flare-ups of chronic obstructive pulmonary disease he may require more frequent breaks."  *Id.*  Further, Dr. Hernandez believed Plaintiff could lift and carry 10 pounds frequently and 20 pounds occasionally.  *Id.*  Due to Plaintiff's chronic low back pain, which

"appear[ed] to be clinically stable," Dr. Hernandez said Plaintiff "may have limitations of bending, stooping and crouching especially in a repetitive manner" during a flare-up of pain. *Id.* Also, Dr. Hernandez opined Plaintiff needed "to avoid chemicals, fumes, [and] dust environments." *Id.* at 225.

Dr. Roxanne Morse performed a psychological evaluation on April 18, 2008. AR at 226-229. Plaintiff reported he was disabled because he was "unable to leave home most days. Rage for little or no reason. Anxious very easily, usually has anxiety all the time." *Id.* at 226. Dr. Morse observed Plaintiff's "knuckles were bruised and scabbed," because put his hand through a wall. *Id.* Plaintiff reported he had "difficulty with many of the activities of daily living due to his degenerative disc disease," but he was "able to bathe and dress himself, drive a car, fix simple meals, participate in light housework, and watch TV." *Id.* at 227. On the WAIS-III, Plaintiff had a verbal IQ of 83, a performance IQ of 85, and a full scale IQ of 83. *Id.* at 228. Dr. Morse observed: "During today's evaluation the claimant was able to understand, remember, and carryout simple, detailed, and complex instructions. The claimant was able to maintain attention and concentration. The claimant displayed pace and persistence for the duration of the evaluation." *Id.* at 229. Dr. Morse opined, "Based upon observations of current behavior and reported history . . . the claimant's ability to interact with the public, supervisors, and coworkers appears to be unimpaired." *Id.*

Dr. Allen Middleton completed a mental residual functional capacity assessment and psychiatric review technique form on May 21, 2008. AR at 230-43. Dr. Middleton opined Plaintiff had affective and personality disorders. *Id.* at 230. Dr. Middleton noted Plaintiff had the ability to follow complex instructions, and his concentration, and pace were "ok." *Id.* at 235. According to Dr. Middleton, Plaintiff had a mild limitation in his activities of daily living. *Id.* at 238. In addition, Dr. Middleton concluded Plaintiff was "not significantly limited" in all areas of understanding and memory, sustained concentration and persistence, and adaptation. *Id.* at 241-42. Plaintiff was moderately limited with his "ability to interact appropriately with the general public," but was "not significantly limited" in all other areas of social interaction. *Id.* at 242. He recommended Plaintiff have "[r]educed work with the general public," but he was [c]apable of relating to coworkers and adapting to a standard workplace." *Id.* at 243. Therefore, Dr. Middleton recommended Plaintiff's mental impairment was non-severe. *Id.* at 251.

4

On May 21, 2008, Dr. Wesley Jackson completed an assessment of Plaintiff's physical residual functional capacity, and noted Plaintiff had scoliosis and mild degenerative disc disease in his lumbar spine. AR at 244-48. Dr. Jackson opined Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently. *Id.* at 245. Dr. Jackson believed Plaintiff had the ability to stand and/or walk for six hours in an eight-hour day, and sit for six hours in an eight-hour day. *Id.* Further, Dr. Jackson found no postural, manipulative, visual, or environmental limitations. *Id.* at 245-47.

On September 18, 2008, Dr. Harvey Bilik affirmed the assessment of Dr. Middleton that Plaintiff's mental impairments were not severe. AR at 299. In addition, Dr. Wong affirmed the initial physical residual functional capacity offered by Dr. Jackson. *Id.*

Dr. Warren Borgquist, Plaintiff's treating physician, completed an assessment of Plaintiff's mental capacity on August 19, 2009.[2] AR at 337-39. Dr. Borgquist opined Plaintiff had "slight" limitations with his ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, and to understand and remember detailed instructions. *Id.* at 337. According to Dr. Borgquist, Plaintiff had a "slight" limitation with carrying out detailed instructions, and a "moderate" limitation with the ability to maintain attention and concentration for extended periods. *Id.* Dr. Borgquist noted Plaintiff "can't even remember to take his meds" and he "often can't sleep so can't focus." *Id.* Further, Dr. Borgquist observed Plaintiff had "wide mood swings" and was "hard to get along [with] even 1-2 months, never long." *Id.* at 337-38. Thus, Dr. Borgquist opined Plaintiff had a "marked" limitation with the "ability to perform activities within a schedule, maintain regular attendance, and be punctual with the customary tolerances." *Id.* at 337. Dr. Borgquist noted Plaintiff "can only work alone," and believed Plaintiff had "marked" limitation with the ability "to work in coordination with or in proximity to others without being distracted by them," "to interact appropriately with the general public," "to get along with coworkers or peers without distracting them or exhibiting behavioral extremes," "to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness." *Id.* at 338-39.

---

[2] Dr. Borgquist first offered an opinion of Plaintiff's mental abilities in a check-box form, without additional annotations, on November 19, 2008. AR at 307-09. However, he offered an amended opinion on August 19, 2009.

5

B.   Plaintiff's Hearing Testimony

Plaintiff testified at a hearing before the ALJ on August 25, 2009. AR at 30. Plaintiff stated his "most disabling" medical conditions were anxiety and chronic back pain due to "an early arthritic curve and ... twisting of [his] spine." *Id.* at 34. Plaintiff reported he had difficulties also with memory, anxiety around people and an "explosive disorder" that caused rage. *Id.* at 35-36. Plaintiff said he had rage all his life, but attributed his depression to his pain. *Id.* at 57.

Plaintiff reported that he had obtained a GED and "went to a business college where [he] learned bartending . . . and restaurant management." AR at 36-37. Plaintiff reported that he was unable to use the skills he learned, and reported he briefly held several jobs, including work in receiving, plastic injection molding, and delivery. *Id.* at 37-39. As a receiving clerk in 1997, Plaintiff said he was "up and down off of a forklift" and lifted up to seventy-five pounds. *Id.* at 39. Plaintiff stated he was "pretty much left alone" and "loved it." *Id.* at 38. Plaintiff stated that doing plastic injection molding required him to lift about twenty pounds and use a press machine, "pull out plastic parts, clean the burs off of it and set it." *Id.* at 39. Plaintiff estimated he lifted "between 40 and 60 pounds" when he worked for the delivery company, "[d]elivering and picking up computer related stuff." *Id.* at 39-40. Plaintiff said his last position was as a hotel maintenance man in 2006. *Id.* at 37. Plaintiff stated his supervisor "had no work ethics whatsoever ... [a]nd was very demeaning and talked down to [him] just with no end." *Id.* As a result, Plaintiff said he "blew up" and stopped working. *Id.* at 38.

Plaintiff said his chronic back pain was in his mid- and low back, and that he began to develop pain just below his neck. AR at 34-35. Plaintiff said the pain was the worst in the right side of his lower back, just above the beltline. *Id.* at 40. According to Plaintiff, his pain was aggravated by anxiety, but movement was a primary cause of his pain. *Id.* at 41. He stated that when he "twist[ed] wrong" or moved his head too quickly, he had "periods of sharp shooting pain" down in his legs. *Id.* at 40. Plaintiff said that when "really sore," he would lie "on his stomach on the floor" because it was painful to lie down or recline. *Id.* at 42.

He said medication helped to relieve or reduce his pain. AR at 41. Plaintiff believed that on "a scale of zero to ten, zero being no pain [and] ten being extreme pain," his pain was "[b]etween six

6

and eight on average." *Id.* at 42.  Plaintiff explained, "If I can relax enough for the pain medication to actually work a little bit, I –that's when it goes down to about a six.  And six is actually really good. To where I forget I'm in pain. And that's great." *Id.* at 54.

Plaintiff said he suffered anxiety attacks, "[s]ometimes daily," which lasted ten minutes to an hour.  AR at 45-46.  He reported an anxiety attack caused him to get dizzy and his mouth to get dry. *Id.* at 45.  Also, Plaintiff stated sometimes he cried, and other times he got "real jittery" and had tightness in his chest. *Id.*  He testified that he was unable to go to his son's football games or wrestling matches "because of the crowds" and his anxiety. *Id.* at 55.  According to Plaintiff, he was given medication that helped his anxiety attacks and calmed him down 'within five minutes." *Id.* at 46.  Plaintiff said he did not like to take the medication because it made him sleep "anywhere from three to ten hours." *Id.*  However, he believed his medication for anxiety was starting to be more effective. *Id.* at 55.  Also, Plaintiff said he smoked marijuana to help relieve his anxiety. *Id.* at 46.

Plaintiff testified he had thoughts of suicide, but would "never act on anything like that."  AR at 47.  Plaintiff stated, "[I]t does bring me down pretty hardcore to where I just want to sleep.  I don't want to see anybody, not even my family.  Especially I don't want them to see me feeling how I feel." *Id.*  Plaintiff testified he felt that way "at least three weeks out of the month" and kept to himself. *Id.*  He said he left the house once or twice a month and interacted only with his family. *Id.*

Further, Plaintiff said he suffered from an "explosive disorder" that meant he had rage when he was around people.  AR at 35.  He said the incidents of rage "sometimes …last[e]d for days," and occurred at least once a week. *Id.* at 35, 48.  According to Plaintiff, "something as little as . . . a little lie" could trigger a rage episode. *Id.* at 49.  Plaintiff stated that when he was in a rage, he felt "like [he] could walk through walls" and he wanted "to squeeze the life out of things." *Id.* at 48.  However, Plaintiff said he had never become physical with people as a result of rage, but he had problems working with others. *Id.* at 49.  Plaintiff said he noticed a change in his behavior and attitude about two weeks before the hearing: "There are a couple of things that normally I would have been very aggressive and open mouthed about that I was pretty calm about." *Id.* at 56.

Plaintiff estimated he could sit for five minutes, stand for "20 to 30 minutes" while shifting his weight from side to side, and walk for five minutes before he needed to take a break. *Id.* at 43.

He believed he could lift and carry about ten pounds. *Id.* at 44.  Plaintiff said he had problems reaching, pulling, and pushing due to the pain in his neck. *Id.* Further, he testified that he had severed tendons in his right hand and fingers, and lost feeling in his hands sometimes. *Id.* at 44-45.

According to Plaintiff, he spent his days playing with his dog by throwing a stick or a Frisbee, playing video games, and watching television.  AR at 50.  Also, Plaintiff said he cooked "[e]very now and then," and did "a majority of . . . the vacuuming and keeping stuff up." *Id.* Plaintiff said his memory, focus, and concentration were "[n]ot good anymore." *Id.* at 51.  Plaintiff said he would like to return to the work force, but did not believe he was able to keep a job, which was "really embarrassing." *Id.* at 57.

C.   Third-Party Statement

On March 4, 2008, Cynthia Reyes completed a third-party function report regarding Plaintiff's impairments, limitations, and abilities. AR at 147-54.  Ms. Reyes reported Plaintiff was able to work, walk longer, and lift before his illness, but could not longer do so. *Id.* at 148.  She reported Plaintiff had a "hard time sleeping even [with] medication due to back pain and raceing (sic) thoughts." *Id.* at 148.  Ms. Reyes observed Plaintiff was "unable to flex [his] arms or reach bend [his] back." *Id.*

According to Ms. Reyes, Plaintiff prepared breakfast for himself because no one else was home to help, and took up to an hour to wash the dishes once a week, with "breaks to sit down and rest." AR at 149.  She explained Plaintiff was unable to do house work or chores "due to back pain and shortness of breath." *Id.* at 150.  Likewise, Plaintiff's "pain level and difficulty breathing" impacted his ability to shop, which he did about "once a month" for thirty minutes to an hour. *Id.* Ms. Reyes believed Plaintiff was unable to pay bills, handle a savings account, or use a checkbook . AR at 150.  Ms. Reyes reported Plaintiff "gets frustrated an anxious" with the household finances, and as a result she "handle[d] the expenses for the household." *Id.*  In addition, she explained Plaintiff was "unable to help paying the bills" due to an inability to concentrate. *Id.* at 151.

Ms. Reyes reported Plaintiff was "unable to tolerate people for long periods of time," but his medication seemed to help him "more often." AR at 151.  Ms. Reyes believed Plaintiff had a "low tolerance level when he [was] anxious." *Id.* at 152.  Further, she said he did not handle stress well;

Plaintiff got "agitated and anxious," and had "a tendency to get violent under stress." *Id.* at 152.  In addition, Ms. Reyes said Plaintiff's impairments affected his ability to get along with others "when in extreme pain," as well as his memory, concentration, understanding, and ability to concentrate or complete tasks.  *Id*.  Ms. Reyes estimated Plaintiff could pay attention for 1-5 minutes, and had "some problem[s] remembering." *Id.*

With regard to the effect of Plaintiff's physical impairments, Ms. Reyes said Plaintiff could not squat or bend, and was unable to sit for long periods of time.  AR at 148, 152.  Plaintiff was able to "stand for short periods of time" and walk "1/4 to 1/2 block" before needing to rest for five to fifteen minutes.  *Id.* at 152.

D.   The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff had not engaged in substantial gainful activity since his application date.  AR at 20.  Second, the ALJ found Plaintiff had the following severe impairments:

> degenerative changes of the cervical spine including probable disk space narrowing at C4-5 and C5-6, degenerative changes of the thoracic spine, mild hypertrophic arthritic changes of the L4-5 and L5-S1 facets, mild disk bulges at the L45 (sic) and L5-S1 levels with chronic back pain and radiculopathy, but without evidence of neural impingement or central or foraminal stenosis at any level, multiple myositis, myalgia, chronic obstructive pulmonary disease (COPD), asthma, asthmatic bronchitis, emphysema, nodular lung lesion, gastroesophageal reflux disease (GERD) with a history of acute gastroenteritis, otitis media, diabetes mellitus, an intermittent rage and explosive disorder, an anxiety disorder, depression, and a bipolar mood disorder.

*Id.*  The ALJ determined these impairments, and combinations thereof, did not meet or medically equal a Listing.  *Id.*  Next, the ALJ found Plaintiff had the residual functional capacity ("RFC") "to perform sedentary work as defined in 20 CFR 416.967(a),[3] except that he cannot be engaged in continuous social interaction with supervisors, co-workers and the general public for more than 2/3 of the total workday."  *Id.* at 21.  With this RFC, Plaintiff was not capable of performing any past relevant work, but there were jobs "in significant number in the national economy" that Plaintiff

---

[3] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. § 416.967(a).  In addition, through sedentary work involves sitting, "a certain amount of walking and standing is often necessary in carrying out job duties."  *Id.*

could perform. *Id.* at 24.  Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. *Id.*

## DISCUSSION AND ANALYSIS

A.  The ALJ erred by failing to address the third-party, lay witness evidence.

Plaintiff argues the ALJ erred by failing to address the evidence regarding Plaintiff's impairments provided by Ms. Reyes.  Plaintiff notes the Dr. Borgquist, Plaintiff's treating physician, replied in part upon the reports of Ms. Reyes for insight into Plaintiff's mental impairments.  (Doc. 17 at 13-14).  The ALJ asserted Dr. Borgquist's opinion was "inordinately based upon [Plaintiff's] subjective complaints," and failed to address statements made by Ms. Reyes to Dr. Borgquist, or the third-party functional report she completed in 2008 regarding Plaintiff's limitations.  *See* AR at 23.  Plaintiff contends this was an error because "[t]he Ninth Circuit has held that the ALJ must consider the testimony of friends and family members." (Doc. 17 at 14) (citing *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)).

A review of the administrative decision reveals the ALJ failed to even acknowledge the statements made by Ms. Reyes in her third-party report.  Significantly, an ALJ must consider statements of "non-medical sources" including spouses, parents, and other relatives in determining the severity of a claimant's symptoms.  20 C.F.R. § 404.1513(d)(4); *see also Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006) ("In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to do work.").  As a general rule, "lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis and internal citations omitted).  To discount the testimony of a lay witness, the ALJ must give specific, germane reasons for rejecting the opinion of the witness.  *Dodrill*, 12 F.3d at 919.

By failing to address the lay witness testimony, ALJ offered no insight regarding his rejection of this evidence.  The district court cannot review evidentiary findings that the ALJ failed to make, and a *complete* failure to address such evidence cannot be considered a harmless error.  *Stout*, 454 F.3d at 1056.  As explained by the Ninth Circuit, "Lay witness testimony as to a claimant's

symptoms is competent evidence that an ALJ must take into account, unless he or she *expressly determines* to disregard such testimony…" *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) (emphasis added). Thus, the ALJ's failure to discuss and properly reject, if that was the ALJ's intention, the statements by Ms. Reyes, is error.

B.   Remand is appropriate in this matter.

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004), citing *INS v. Ventura*, 537 U.S. 12, 16 (2002). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen*, 80 F.3d at 1292. In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed. *Varney v. Sec'y of Heath & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Applying the *Smolen* factors to this case, the ALJ failed to address or reject the lay witness evidence presented in the action. Significantly, the statements by Ms. Reyes include evidence regarding Plaintiff's abilities and limitations given his mental and physical impairments. The veracity of her statements may support a finding of disability. Thus, the matter should be remanded for the ALJ to evaluate the evidence, because "the ALJ, not the district court, is required to provide specific reasons for rejecting lay testimony." *Stout*, 454 F.3d at 1054.

## CONCLUSION

For all these reasons, the Court concludes the ALJ erred in his evaluation of the evidence. The ALJ failed to address the lay witness testimony, and therefore did not set forth legally sufficient reasons to reject the evidence. As a result, the ALJ failed to apply the correct legal standards, and the administrative decision should not be upheld by the Court. *See Sanchez*, 812 F.2d at 510.

Because the Court remand is appropriate on this matter for further consideration of the evidence, it offers no findings on the remaining issues.

Accordingly, **IT IS HEREBY ORDERED**:

1. This matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
2. The Clerk of Court is directed to enter judgment in favor of Plaintiff Daniel Harlander and against Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **February 17, 2012**                              /s/ **Jennifer L. Thurston**
                                                                             UNITED STATES MAGISTRATE JUDGE